ROCK ISLAND OIL & REFINING CO.,
Inc., et al. v. HUTCHINSON et ux.

No. 34881.   Feb. 24, 1953.

Rehearing Denied March 31, 1953.

*255  P. 2d 234.*

C. D. Cund, Duncan, Edward Howell, Oklahoma City, and J. D. DeBois, Duncan, for plaintiffs in error.

H. B. Lockett and Hegel Branch, Duncan, for defendants in error.

O'NEAL, J.   This is an action at law to recover damages for loss of livestock alleged to have resulted by drinking polluted water out of Cow Creek. Plaintiffs, the owners of the stock, contend that the injury and resulting damages arose out of defendants' operation of oil refineries located several miles south of Duncan, Oklahoma. For convenience we will refer to L. S. Hutchinson and Temple L. Hutchinson as plaintiffs, and the defendants, Rock Island Oil & Refining Company, Inc., a corporation, and Sunray Oil Corporation, a corporation, as defendants.

Plaintiffs occupied a tract of land in Jefferson county, some distance south of the refineries.  Cow Creek runs from a point north of Duncan, adjacent to the refinery properties in a southerly direction to plaintiffs' land.  Plaintiffs' cause of action is based upon the alleged tort of the defendants in permitting crude oil and other deleterious substances to escape from the refineries, and which drained into Cow Creek, poi-

soning the waters thereof and causing the death of one cow, one heifer, and loss of time and expense in furnishing an alternative water supply for their stock. Plaintiffs recovered a judgment for actual damages in the sum of $659, and the sum of $1,500 as exemplary damages, and from the overruling of defendants' motion for a new trial, the appeal is taken.

The sole question presented on appeal is whether plaintiffs' evidence is sufficient to support the verdict and the judgment rendered thereon.

Complaint having been lodged with the State Game and Fish Department of the state, a state game ranger, in July, 1948, visited the refineries and examined various pits and ponds upon the refinery grounds. He testified that he found that pipes from the refineries carried refinery waste into these pits, or ponds, which thereafter, by gravity, was conveyed into wells; that when the wells were filled up with fluid they were emptied into open drains or ditches which drained into Cow Creek. He testified as to the condition of Cow Creek between Duncan and the refineries, and stated that he found live fish in the stream, but that below the refineries, as the stream flowed in a southerly direction, he found many dead fish in the stream and found much evidence of refinery waste therein.

Another Game and Fish Department employee testified he had examined Cow Creek from its head north of Duncan down to Red River, during the years 1946, 1947, 1948 and 1949; that in March, 1949, he found live fish in Cow Creek north of the refineries and many dead fish south of the refineries; that he found refinery pollution draining into Cow Creek during the years 1946 to 1949, inclusive.

Another witness testified that he had lived in Comanche approximately 46 years during which time he had frequently observed the condition of the waters of Cow Creek; that in the middle of October, 1948, he was employed in the repair of a bridge crossing Cow Creek at a point two miles south of the refineries; that on the first day of his employment at this point he observed that the water in the stream looked milky, and that a few days thereafter, it turned black and had a very bad odor.

Another witness owning a farm near Waurika testified that Cow Creek emptied into Beaver Creek, which latter creek ran through his farm; that in the middle of October, 1948, the stream was badly polluted, killing a large number of catfish, frogs and turtles, and that he found rabbits and squirrels lying dead along the bank of the stream. He further stated that he accompanied the game ranger to the refinery grounds and inspected their method of disposing of their effluent waters; that upon the refinery grounds he saw oil, boiler drainings, sludge and muck being emptied into runways which drained into Cow Creek; he identified the sludge pits on each of the refinery grounds and stated that they would overflow during heavy rains and that an unusual amount of pollution came down the stream in October, 1948; that the character of the pollution he observed at the refinery looked like the pollution he observed in Cow Creek.

Another witness who had a tract of land near Waurika testified that Cow Creek was badly polluted with oil waste; that he observed many dead fish in the stream; that on one occasion he accompanied Mr. Sparks, the game ranger, to each of the refineries and found evidence of oil escaping from the Rock Island properties which he stated smelled like creosote dip.

Another witness testified that in October, 1948, Cow Creek, at a point between Addington and Terral, contained pollution of a grayish color which had a very bad odor. This witness also accompanied the game ranger to the defendants' refineries and found that the sludge pits had broken due to a previous heavy rain, and that the contents of the pits had drained into the creek.

Demurrers were interposed by the defendants to plaintiffs' evidence based upon the assertion that the facts proven were insufficient to make out a case in favor of the plaintiffs and against the defendants. The demurrers were overruled with exceptions.

Defendants then introduced the deposition of V. G. Heller, Professor of Biological Chemistry at the Oklahoma A & M College. He testified that H. M. Marney mailed him two samples of water, one taken from Cow Creek and the other from the well on the Mize farm on February 3, 1949, and from these samples he found and so advised Mr. Marney as follows:

"I seriously doubt if it would be advantageous to make a quantitative determination of the exact amount of inorganic materials present as long as we know the total amount would not be injurious. I think the only chemical analysis that is going to help you is to find when there are sulfides or similar compounds present that are truly toxic. We can certify to the bad physical appearance, bad odor, and to the unsavory flavor, but we have to admit that there is none of the usual oil field brines, acids, or alkalies present in toxic quantities. * * * In your waters we are dealing with a different type of material. The total amount of dissolved materials present would definitely not be toxic to either man or animal. The amount of salts present are in the form of sodium chloride, calcium chloride, or magnesium chloride, so often found in oil well brines and which are poisonous in large quantities either to plants or animals, is not present in your water. Neither do we find the presence of alkalies as are sometimes found about refineries or do we find any free acid, so from the standpoint of all these normally discussed materials in waters, I think you would have no case for damages."

Officials of the cities of Duncan and Comanche testified that these cities emptied their sewage disposal into Cow Creek. A witness living north of the refineries testified that the waters of Cow Creek in 1947 and 1948 were badly polluted by sewage from Duncan, and

that he lost two cows in 1947 that had drunk water from the creek.

A chemist who was employed by Sunray Oil Corporation testified that he took samples of water from Sunray's sewer outlet into Cow Creek on October 27, 1948, and from the analysis made found the water contained no element harmful to cattle. He arrived at the same conclusion from samples of water taken on October 27, 1948, at a point seven miles south of Comanche, and also from samples of water taken in November, 1948, at Sunray's sewer outlet to Cow Creek. In November and December, 1948, he took samples of water from the creek south of the refineries and arrived at the same conclusion. He further testified that the effluent water which Sunray permitted to flow into Cow Creek during the periods complained of would not be injurious to animals or livestock.

The city chemist of Oklahoma City testified that he visited the refineries sometime after the institution of the present suit, and from his examination determined that their operations did not add bacteria to the waters of Cow Creek. He further stated that he examined the analysis made by Sunray's chemist and concurred in the conclusion that the analysis did not disclose that the water from the refineries would be harmful to livestock.

Defendants' evidence sustains the conclusion that they have invested large sums in the installation of equipment to run off their effluent water, free from oil and refinery contamination, and that the method they employed in disposing of their effluent water was the best known to the industry.

Although defendants' evidence sustains their contention that they did not deliberately permit oil or refinery waste to escape from their pits or ponds, it does disclose that they had lost some oil refinery waste on several occasions due to breaks of the ponds. It is obvious that the pits, or ponds, were constructed for the purpose of im-

pounding any crude oil or refinery waste which might escape during refinery operations. The escaped oil or waste was recaptured and re-run to stills for refining. The excess residue of oil waste in the ponds was disposed of either by evaporation or by burning the same. The evidence also supports defendants' contention that the cities of Duncan and Comanche empty their sewage into Cow Creek causing organic pollution, and that some salt water from the Empire Field and also the Grookla and Pace leases or properties drained into Cow Creek.

Plaintiffs assert by written and oral argument that the evidence as a whole establishes that refinery oil and waste escaped from the defendants' refineries and drained into Cow Creek destroying the water thereof for stock purposes, and which resulted in the damages proven, and that the verdict of the jury being supported by competent and substantial evidence, the judgment rendered thereon cannot be set aside upon appeal. Plaintiffs cite numerous cases in support of the rule thus asserted.

Plaintiffs' evidence, however, does not sustain the full amount of the judgment rendered for actual damages. The damages established are sustained solely upon the plaintiffs' evidence of value as follows: One cow $242; one heifer $207; one aborted calf $60, and the value of services in hauling water to stock $90, or a total of $599. The verdict for actual damages is therefore affirmed in the sum of $599.

We are of the view and so hold that the evidence sustains a causal connection with the negligence averred and the injuries received, and that defendants' assertion that the verdict and the judgment thereon is only supported by an inference upon an inference or presumption upon presumption, is without merit. Defendants rely upon Prest-O-Lite Co., Inc., v. Howery, 169 Okla. 408, 37 P. 2d 303; Shell Petroleum Corporation v. Worley, 185 Okla. 265, 91 P. 2d 679; Shell Oil Co. v. Blubaugh, 199 Okla.

353, 185 P. 2d 959, and Mul-Berry Oil Co. v. Penny, 195 Okla. 574, 159 P. 2d 243, as supporting their assertion of a want of proof to sustain the verdict and judgment.

The Prest-O-Lite case, supra, is distinguishable from the facts in the instant case. In that case plaintiff testified he did not know why his fowls and hogs died. A veterinarian testified that the cow was suffering from enteritis, and that he assumed that drinking the water from the creek was the cause of the trouble. Furthermore, the evidence did not show damage to the vegetation along the stream, or fish in the stream. It was therefore held that the damages could not be sustained upon the hypothesis that the stream was polluted with deleterious substances, or that the fowls and animals died as a result of drinking the water.

In the Worley case, supra, plaintiff sought damages to 100 small pecan trees planted some months prior to the overflow of a creek running through plaintiff's land. The water spread over an area of one and one-half miles wide, and at places upon the land it was ten feet deep. One witness stated the water tasted salty. The evidence further disclosed that the damage to the young trees might have been occasioned from three other causes. We therefore held the evidence failed to show a causal connection between the alleged wrongful act and the injury. It is stated in the opinion of the case, as follows:

"In this case not a single witness ventured an opinion that the pecan trees on plaintiff's land died because of salt contained in the water which overflowed his land in the flood of June, 1935."

The Blubaugh case, supra, turned upon plaintiff's failure of proof to establish that one of the wells contained contamination from oil wells alleged to have been improperly plugged. The proof disclosed that some oil got into the well. When defendant was so informed, it had the oil pumped out and

the well thereafter produced good water. We there held that the proof failed to show a causal connection with the claim that the oil came from improperly plugged wells, and the resulting damage was not established.

The Mul-Berry case, supra, is based upon facts comparable to the Worley case in that plaintiff failed to establish by proof whether the injury to plaintiff's cattle was occasioned by salt water from defendant's properties, or "burned up" pasture, or due to the fact that the cows had suckling calves during the period, as any or all of these conditions might have been the cause of injury, if any, although several witnesses expressed the opinion that plaintiff's calves were only worth $12 to $15 per head during April, May and June, and to the middle of July, the period covering the alleged pollution and injury. The proof shows that the calves were sold in August for $31.76 per head which was the top prevailing market price. We therefore held that there was a failure of proof to sustain the verdict.

Isolated statements relied upon in the cited cases may seem to give weight to defendants' contention of the want of sufficient proof in the case at bar to sustain the judgment, but as we read the cases relied upon we find them distinguishable in point of fact. In each case there was a definite failure to prove the cause of injury and that damages resulted therefrom. In the instant case there had been no rains immediately prior to the middle of October, 1948, which would have increased the flow of the water in Cow Creek, but then on the 13th day of October, a large volume of water, impregnated with oil and refinery waste, came down the stream. One angler who had caught some 40 pounds of fish a few days before October 13th testified that after the deluge of the water had passed down the stream, the banks of the creek were lined with dead fish, turtles, squirrels and cottontails, and, as stated by another witness, the pollution looked and smelled like the sludge and pollution he had observed in defendants' refinery pits. Furthermore, plaintiff's stock had access to the waters of Cow Creek for years prior to said date without injury, but after its use for several days following the flow, two of his cattle died. These facts removed from the realm of speculation or conjecture the cause and effect of the matters here complained of.

The remaining question is whether the facts proven warrant the judgment for exemplary damages rendered against the defendants. The evidence is without contradiction that no effluent water carrying refinery waste was deliberately or knowingly permitted to empty into Cow Creek. It was shown that the embankments of the pits, or ponds, were broken on two occasions by reason of very heavy rains, which caused their contents to drain into Cow Creek. Furthermore, it is shown that when the game ranger and others visited the refineries to ascertain the cause of the pollution of Cow Creek, the officials of the plants stated that they were glad to work with landowners upon the creek to prevent pollution, and that they would investigate any claim of pollution or run down the source thereof and see if it could be avoided. On another occasion, Mr. Coleman, a member of the House of Representatives, accompanied several landowners upon an inspection trip of the refineries to ascertain the cause of pollution, and in a conversation with a representative of Sunray they were advised that the break of a dike caused the stuff to get away; they were also advised by the same representative of Sunray that the company had procured additional land for larger vats or ponds for the impounding of refinery water.

In our view of the case the record does not disclose such gross negligence in the operation of the defendants' refineries and such disregard of plaintiffs' rights as to amount to an evil intent or gross negligence to sustain exemplary damages. The record must establish fraud, malice, oppression or gross neg-

ligence. No competent evidence was adduced to show that defendants committed any overt act to come within the announced rule. Pure Oil Co. et al. v. Quarles, 183 Okla. 418, 82 P. 2d 970, and Keener Oil & Gas Co. v. Stewart, 172 Okla. 143, 45 P. 2d 121.

The judgment as modified in favor of the plaintiff for the sum of $599 is affirmed. The judgment for exemplary damage in the sum of $1,500 is reversed.

JOHNSON, V. C. J., and WELCH, CORN, DAVISON, WILLIAMS, and BLACKBIRD, JJ., concur. HALLEY, C.J., and ARNOLD, JJ., dissent.